**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **PATRICK PHILLIPS, et al.,** | : | |
| **Plaintiffs,** | : | **Case No. 2:04-cv-207** |
| **v.** | : | **Judge Holschuh** |
| **DEPUTY TROY STEVENS, et al.,** | : | **Magistrate Judge Abel** |
| **Defendants.** | : | |
| | : | |

**MEMORANDUM OPINION & ORDER**

Following their arrest at a Rolling Stones concert, Plaintiffs Patrick Phillips and Timothy

Mollette filed suit pursuant to 42 U.S.C. § 1983 seeking recovery for alleged violations of their

Fourth Amendment rights.  Plaintiffs sued a number of law enforcement officers, including

Columbus police officers Thomas Paige, Anthony Richardson, Donald Paden, and James Barnes,

and the City of Columbus (collectively the "City Defendants").  This matter is currently before

the Court on the City Defendants' motion for summary judgment.  (Record at 42).  For the

reasons set forth below, that motion is granted in part and denied in part.

**I.      Background**

On October 21, 2002, Plaintiffs Phillips and Mollette attended a Rolling Stones concert at

Nationwide Arena in Columbus, Ohio.  Both men were drinking; Mollette also admitted to

smoking marijuana.  (Phillips Dep. at 24; Mollette Dep. at 22, 108-109).  During the concert,

Plaintiffs purchased several t-shirts and other souvenirs from licensed vendors inside the arena.

That evening, Franklin County Sheriff's Deputies Sanford Crayton and Troy Stevens were

working a private plainclothes detail to stymie the sale of "bootleg" merchandise outside the

Rolling Stones concert.  After the concert, as Plaintiffs left the arena, Phillips was showing

Mollette some of the Rolling Stones merchandise he had purchased.  Crayton and Stevens

approached them to determine whether the merchandise was authentic.

Subsequent events are disputed.  Mollette testified that Crayton and Stevens ran up to

them in a threatening manner.  Dressed in jeans and sweatshirts, Crayton and Stevens made no

effort to identify themselves as police officers.  Stevens grabbed the bag of merchandise from

Phillips and tried to pull it away.  (Mollette Dep. at 37).  Crayton grabbed Mollette's shoulder.

Plaintiffs, believing Crayton and Stevens to be assailants, attempted to fight them off.  (Id. at

53).

Deputy Stevens testified, however, that he approached Phillips with his badge in his hand

and identified himself as a Franklin County Sheriff's Deputy.  (Stevens Dep. at 80).  After

Stevens asked to see the bag of merchandise, Phillips elbowed Stevens and punched him several

times, causing a contusion on Stevens' left temple.  (Id. at 86-87, 95, 99, 119).  Meanwhile,

Deputy Crayton approached Mollette and allegedly identified himself as a Franklin County

Sheriff's Deputy.  (Crayton Dep. at 30).  Crayton saw Phillips push Stevens, and then Mollette

"sucker punch[ed]" Crayton.  (Id. at 38, 43).  Mollette told Crayton, "you're not a cop."  (Id. at

39).  Crayton was later treated at Grant Hospital for an injured lip, abrasions, and contusions.

(Id. at 44).  Mollette admits that he threw some punches at Crayton, but argues that he was acting

in self-defense.  (Mollette Dep. at 55).

Thomas Paige, Anthony Richardson, Donald Paden, and James Barnes were four

uniformed Columbus police officers who were directing traffic in the area.  They rushed to the

scene to break up the fight between Mollette and Crayton.  Officer Paige, being the first to

2

arrive, "grabbed both parties as to separate them." (Paige Dep. at 14).  Mollette claimed he was being robbed.  Deputy Crayton told Paige that he was a police officer.  (Id).  Officer Paige requested proof, and Deputy Crayton pulled his badge out from under his sweatshirt or jacket. (Id. at 15).  According to Paige, while Crayton showed his identification, Mollette punched Crayton in the face again.  (Paige Aff. ¶ 8; Paige Dep. at 17).  Mollette then freed himself from Paige's grasp, prompting Paige to step forward and again grab his arm.  (Paige Aff. ¶ 8; Mollette Dep. at 60-61).

Officer Richardson arrived in time to see Mollette break free from Paige's grasp. Richardson took hold of Mollette's arm and forced him to the ground.  Mollette claims that Richardson "tackled" him from behind and slammed him face-first into the street.  (Mollette Dep. at 60-63).  Officer Paden and Sergeant Barnes then joined the effort to handcuff Mollette. Mollette refused commands to put his hands behind his back.  According to the officers, he kept putting his arms under his body and kicking his feet.  (Richardson Aff. ¶¶ 5-6; Paden Dep. at 21; Paden Aff. ¶¶ 4-6 ).

Mollette denies that he was resisting arrest.  He claims that he was simply trying to get his arms underneath him to push his head up and protect his face from scraping against the pavement.  (Mollette Dep. at 63, 69, 72-73).  The officers testified, however, that they did not believe that Mollette was simply trying to protect his face; they contend that he was actively impeding their efforts to handcuff him.  (Barnes Dep. at 32; Paden Aff. ¶ 6).  Each time Mollette tried to get up, the officers pushed him back down to the pavement.  The officers used varying degrees of force in an attempt to restrain him, including two separate mace bursts (Paden Aff. ¶ 4), numerous fist strikes (Paden Aff. ¶ 5), numerous knee strikes (Richardson Aff. ¶ 7), and

several blows with a flashlight (Paden Aff. ¶ 6).  After several minutes, the officers were able to handcuff Mollette.  Due to Mollette's continued and incessant kicking, they also fettered his legs with a hobble strap.  (Richardson Aff. ¶ 7; Paden Aff. ¶ 6).  Both plaintiffs were charged with assault on a peace officer; Mollette was also charged with resisting arrest.

Lieutenant William Fineran conducted an internal investigation of the force used against Mollette.  In his report, dated November 22, 2002, he noted that Mollette suffered abrasions to the right elbow, forehead, right temple, and left cheek, had a reddened right eye and left wrist, had welts on his right lower ribcage, upper and lower back, and had a reddened left ear.  (Ex. to Pls.' Mot. Summ. J.).  Lieutenant Fineran concluded that all force used by the Columbus police officers against Mollette on the night in question was necessary, justified, and within departmental policy.

After all charges brought against Plaintiffs were dismissed, they filed suit against Crayton, Stevens, Paige, Richardson, Barnes, and Paden.  They also sued Franklin County Sheriff's Deputy Michael Kirkpatrick, Sheriff Jim Karnes, the City of Columbus, and RST Concerts, Inc.[1]  Plaintiffs seek recovery under 42 U.S.C. § 1983 for alleged violations of their Fourth Amendment rights.  They claim that they were victims of unlawful search and seizure, arrest and prosecution without probable cause, and excessive and unnecessary use of force.  They further allege that these constitutional violations were caused, in part, by policies or customs of the City of Columbus.  The City Defendants have moved for summary judgment on

---

[1]  The Court has already granted summary judgment in favor of RST Concerts and Deputy Kirkpatrick.  The parties agree that Plaintiffs' claims against Crayton, Stevens and Karnes are not amenable to summary judgment.

all of Plaintiff Mollette's claims against them.[2]

## II.    Standard of Review

Although summary judgment should be cautiously invoked, it is an integral part of the

Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of

every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The standard for summary judgment is found in Federal Rule of Civil Procedure 56(c):

> [Summary judgment] . . . shall be rendered forthwith if the pleadings, depositions,
> answers to interrogatories, and admissions on file, together with the affidavits, if
> any, show that there is no genuine issue as to any material fact and that the
> moving party is entitled to judgment as a matter of law.

Summary judgment will be granted "only where the moving party is entitled to judgment as a

matter of law, where it is quite clear what the truth is . . . [and where] no genuine issue remains

for trial, . . . [for] the purpose of the rule is not to cut litigants off from their right of trial by jury

if they really have issues to try." Poller v. Columbia Broadcasting Sys., 368 U.S. 464, 467

(1962) (quoting Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627 (1944)).  See also

Lansing Dairy, Inc. v. Espy, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine

if there are genuine issues of fact to be tried.  Lashlee v. Sumner, 570 F.2d 107, 111 (6th Cir.

1978).  The court's duty is to determine only whether sufficient evidence has been presented to

make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the

credibility of witnesses, or determine the truth of the matter.  Anderson v. Liberty Lobby, Inc.,

---

[2] It is undisputed that the Columbus police officers were not involved in Plaintiff
Phillips' arrest and that he has no claims against them.

477 U.S. 242, 249 (1986); Weaver v. Shadoan, 340 F.3d 398, 405 (6th Cir. 2003).

In a motion for summary judgment, the moving party bears the initial burden of showing that no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law. Leary v. Daeschner, 349 F.3d 888, 897 (6th Cir. 2003). All the evidence and facts, as well as inferences to be drawn from the underlying facts, must be considered in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Wade v. Knoxville Util. Bd., 259 F.3d 452, 460 (6th Cir. 2001). Additionally, any "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-60 (1970).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48 (emphasis in original). A "material" fact is one that "would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of [an] appropriate principle of law to the rights and obligations of the parties." Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984). See also Anderson, 477 U.S. at 248. An issue of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. See also Leary, 349 F.3d at 897.

If the moving party meets its burden, and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to

establish the existence of an element essential to that party's case and on which that party will

bear the burden of proof at trial.  <u>Celotex</u>, 477 U.S. at 322.  The nonmoving party must

demonstrate that "there is a genuine issue for trial," and  "cannot rest on her pleadings."  <u>Hall v.

Tollett</u>, 128 F.3d 418, 422 (6th Cir. 1997).

> When a motion for summary judgment is made and supported as
> provided in this rule, an adverse party may not rest upon the mere
> allegations or denials of the adverse party's pleading, but the
> adverse party's response, by affidavits or as otherwise provided in
> this rule, must set forth specific facts showing that there is a
> genuine issue for trial.  If the adverse party does not so respond,
> summary judgment, if appropriate, shall be entered against the
> adverse party.

Fed. R. Civ. P. 56(e).

The existence of a mere scintilla of evidence in support of the opposing party's position

is insufficient; there must be evidence on which the jury could reasonably find for the opposing

party.  <u>Anderson</u>, 477 U.S. at 252.  The nonmoving party must present "significant probative

evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material

facts."  <u>Moore v. Phillip Morris Companies, Inc.</u>, 8 F.3d 335, 340 (6th Cir. 1993).  The court

may, however, enter summary judgment if it concludes that a fair-minded jury could not return a

verdict in favor of the nonmoving party based on the presented evidence.  <u>Anderson</u>, 477 U.S. at

251-52; <u>Lansing Dairy, Inc.</u>, 39 F.3d at 1347.

## III.    Discussion

Plaintiff Mollette alleges that the City Defendants arrested him without probable cause

and used excessive force during the course of his arrest.  He also brings a malicious prosecution

claim against Officer Paden, who initiated criminal charges against him for resisting arrest.

Mollette seeks recovery under 42 U.S.C. § 1983.  That statute states, in pertinent part:

7

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper
> proceeding for redress . . .

42 U.S.C. § 1983.  In order to recover under § 1983, a plaintiff must prove that a person, acting

under color of law, violated his rights as guaranteed by the Constitution or laws of the United

States.  See Adickes, 398 U.S. at 150.  It is undisputed that the Columbus police officers were

acting under color of law on the night in question.  At issue is whether the City Defendants

violated his Fourth Amendment right to be free from unreasonable seizures.

### A.    Individual Capacity Claims against the Officers

Mollette has sued Columbus police officers Paige, Richardson, Barnes, and Paden in

their individual capacities, asserting claims of false arrest, prosecution without probable cause,

and use of excessive force.  They have moved for summary judgment, asserting the defense of

qualified immunity.

"Qualified immunity is an affirmative defense that shields government officials 'from

liability for civil damages insofar as their conduct does not violate clearly established statutory

or constitutional rights of which a reasonable person would have known.' " Estate of Carter v.

Detroit, 408 F.3d 305, 310-11 (6th Cir. 2005) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818,

(1982)).  Once a defendant raises the defense of qualified immunity, the plaintiff bears the

burden of proving that the defendant is not entitled to qualified immunity.  Silberstein v. City of

Dayton, 440 F.3d 306, 311 (6th Cir. 2006).

As the Supreme Court explained in Saucier v. Katz, 533 U.S. 194 (2001), qualified immunity involves a two-step inquiry.  First, the court must determine whether the facts, viewed in the light most favorable to the plaintiff, show that a constitutional violation has occurred.  Id. at 201.  Second, the court must determine whether the constitutional right was clearly established.  The relevant inquiry is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Id. at 201-02.  If there is no constitutional violation, or if the "law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."  Id. at 202.  Using this framework, the Court then turns to an analysis of each of Mollette's claims.

### 1.    False Arrest

Mollette alleges that Defendants arrested him without probable cause, in violation of his Fourth Amendment rights.[3]  The first step in the qualified immunity analysis is to determine whether, viewing the facts in the light most favorable to the plaintiff, a constitutional violation occurred.  For probable cause to exist, the facts and circumstances within the officer's knowledge must be "sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense."  Michigan v. DeFillippo, 443 U.S. 31, 37 (1979).

Mollette argues that, at the time Officer Richardson tackled him from behind, none of the Columbus police officers had seen Mollette commit any crimes, and Deputy Crayton had not told them that Mollette had committed any crimes.  Mollette concedes that if Crayton had

---

[3]  Mollette concedes, however, that Officer Paige had the requisite "reasonable suspicion" to make a Terry stop.  See Terry v. Ohio, 392 U.S. 1 (1968).

probable cause for an arrest, then other officers could assist in making the arrest even if they did

not know exactly what had happened before they arrived.  Mollette argues, however, that

because the facts concerning his encounter with Crayton are hotly disputed and cannot be

decided on summary judgment, neither can the false arrest claim against the Columbus police

officers.  The Court disagrees.

As noted earlier, the parties disagree about whether Crayton identified himself to

Mollette as a police officer when he first approached him.  There also appears to be factual

dispute about whether Officer Paige saw Mollette punch Crayton.  Paige testified that as Deputy

Crayton was showing him his identification, Mollette punched Crayton in the face.  (Paige Dep.

at 17; Paige Aff. ¶ 8).  During the investigation following Mollette's arrest, Paige also told

Lieutenant William Fineran that he "saw the individuals involved pushing one another, and then

punching each other."  (Action-Response to Resistance Report at 7).  Deputy Crayton, however,

testified that Mollette did not hit him again after Officer Paige arrived on the scene, (Crayton

Dep. at 49-51), and Mollette denies that he punched Crayton in Paige's presence.

Nevertheless, these factual disputes do not preclude summary judgment on Mollette's

claim of false arrest against the Columbus police officers.  Regardless of what transpired

between Mollette and Crayton before the Columbus police officers arrived on the scene, and

regardless of whether Officer Paige saw Mollette punch Crayton, the other, undisputed

observations of Officers Paige and Richardson after they arrived on the scene were clearly

sufficient to support a reasonable belief that Mollette had committed *some* criminal offense.

10

It is undisputed that Mollette and Crayton were still engaged in some kind of a physical scuffle when Officer Paige arrived on the scene. Mollette himself testified that Paige hit him with his shoulder to break up the "fight." (Mollette Dep. at 60). Based on what he observed, Paige had probable cause to arrest Mollette for assault and/or disorderly conduct.[4] Moreover, even if Mollette might have been able to defend against assault charges by arguing that he was acting in self-defense, this does not negate the fact that, at the moment he was arrested, the police officers had probable cause to believe that he had assaulted Crayton. See Gumble v. Waterford Twp., 171 F. App'x 502, 507 (6th Cir. 2006) (rejecting argument that claim of self-defense eliminates probable cause for arrest); Thomas v. Arn, 704 F.2d 865, 875 (6th Cir. 1983) (under Ohio law, theory of self-defense does not negate elements of crime of aggravated assault).

Events observed by Officer Richardson also support a finding of probable cause for Mollette's arrest. Mollette admits that he pulled away and broke the grasp Officer Paige had on his arm. (Mollette Dep. at 61; Paige Dep. at 18). Officer Richardson arrived in time to see Mollette separate from Officer Paige and "gain distance between them." (Richardson Dep. at 18). As Officer Paige states in his affidavit, probable cause existed, at that point, to arrest Mollette for resisting arrest and obstructing official business. (Paige Aff. ¶ 9).[5]

---

[4] Ohio's "assault" statute states that "[n]o person shall knowingly cause or attempt to cause physical harm to another." Ohio Revised Code § 2903.13(A). Ohio's "disorderly conduct" statute states that "[n]o person shall recklessly cause inconvenience, annoyance or alarm to another by doing any of the following: (1) Engaging in fighting, in threatening harm to persons or property, or in violent or turbulent behavior." Ohio Revised Code § 2917.11(A)(1).

[5] Ohio Revised Code § 2921.33 states, "[n]o person, recklessly or by force, shall resist or interfere with a lawful arrest of the person." Ohio Revised Code § 2921.31(A) states, "[n]o person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the

11

Therefore, even viewing the evidence in the light most favorable to Mollette, and regardless of any factual disputes concerning what happened between Crayton and Mollette before the Columbus police officers arrived on the scene, no reasonable jury could find that the officers lacked probable cause to believe that Mollette had committed a crime.  Because probable cause existed for Mollette's arrest, there was no constitutional violation, and there is no need for the Court to analyze the second prong of the qualified immunity test.  Paige, Richardson, Barnes, and Paden are entitled to qualified immunity on the claim of false arrest.

### 2.    Prosecution Without Probable Cause

Mollette also brings a § 1983 malicious prosecution claim against Officer Paden, who initiated criminal proceedings on the charge of resisting arrest.[6]  Mollette claims that Paden lacked probable cause to believe that he had committed that crime.  Although Defendants did not specifically move for summary judgment on this claim, the Court's finding that the officers had probable cause to arrest Mollette appears to foreclose this malicious prosecution claim.  See Fox v. DeSoto, 489 F.3d 227, 237-38 (6th Cir. 2007); Thacker v. City of Columbus, 328 F.3d 244, 259 (6th Cir. 2003).

### 3.    Excessive Force

Mollette next alleges that the Columbus police officers used excessive force during the course of his arrest, first by tackling him and slamming him face-first to the ground, and then by

_____

public official's lawful duties."

[6]  The Court has previously denied Mollette's motion for summary judgment on this claim.

physically beating him. Because Defendants again argue that they are entitled to qualified immunity, the Court must first determine whether, viewing the facts in the light most favorable to Mollette, a constitutional violation occurred. If the Court finds such a violation, it must move on to the second step of the qualified immunity analysis and determine whether the constitutional right at issue was clearly established. <u>Saucier</u>, 533 U.S. at 201-02. The right to be free from the use of excessive force during the course of an arrest is a clearly established constitutional right. <u>See</u> <u>Neague v. Cynkar</u>, 258 F.3d 504, 507 (6th Cir. 2001). However, as the Supreme Court held in <u>Saucier</u>, the Court must analyze whether the right is clearly established "in light of the specific context of the case, and not as a broad general proposition." 533 U.S. at 201.

Police officers are, of course, entitled to use some degree of force to effect an arrest. The Fourth Amendment, however, guards against the use of excessive force. <u>Graham v. Connor</u>, 490 U.S. 386, 394 (1989). Claims of excessive force are judged under an "objective reasonableness" standard. <u>Id.</u> at 388. The Supreme Court has held that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." <u>Id.</u> at 396. The relevant question is whether an officer's actions are "objectively reasonable" in light of the facts and circumstances confronting him at the time. <u>Id.</u> at 397. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." <u>Id.</u> at 396-97. As the Sixth Circuit has recently noted, the courts must give police officers a "certain latitude to make mistakes." <u>Bouggess v. Mattingly</u>, 482 F.3d 886, 894 (6th Cir. 2007). Nevertheless, "[e]ven a split-second decision, if sufficiently wrong, may not be

protected by qualified immunity."  Id.

The question of whether police officers used excessive force in effecting an arrest is one that is extremely fact intensive and hence dependent upon the unique circumstances of each case. Three factors are generally considered to determine whether the amount of force used was reasonable under the circumstances: (1) "the severity of the crime at issue;" (2) "whether the suspect poses an immediate threat to the safety of the officers or others;" and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight."  Graham, 490 U.S. at 396.

### a.    Tackling

Mollette first argues that Officer Richardson used excessive force when Richardson tackled him from behind, without any warning, and slammed him face-first to the pavement. Defendants argue that because Mollette had been involved in an assault on a police officer, was under the influence of drugs and alcohol, and had broken away from Officer Paige's grasp, Richardson's conduct was objectively reasonable.

For purposes of the pending motion, the Court must, of course, view the evidence in a light most favorable to Plaintiff.  Although Mollette was charged with assault on a peace officer, a fairly serious offense, and he admits punching Deputy Crayton, Mollette contends that he did not know that Crayton was a police officer.  Crayton was not in uniform that night and, according to Mollette, did not identify himself as a police officer.  Mollette thought that Crayton was attempting to rob him, and maintains that he was acting in self-defense.  He was in the process of explaining this to Officer Paige when Officer Richardson tackled him from behind and slammed him face-first to the pavement.  Mollette did not know what was happening or why.  Mollette notes that no one had told him he was under arrest and no one gave him the

14

opportunity to voluntarily submit to handcuffing.

In <u>Lyons v. City of Xenia</u>, 417 F.3d 565 (6th Cir. 2005), the Sixth Circuit noted that tackling a suspect has been found to rise to the level of excessive force where "the claimants did not pose a tenable threat to the officers' safety" or where the tackling was followed by additional uses of force such as repeatedly slamming the suspect's head to the floor or using punishing pain compliance techniques. <u>Id.</u> at 578 (internal citations omitted).  In this case, Mollette denies that he posed a threat to anyone, and it is undisputed that immediately after Officer Richardson tackled him, the officers launched into a prolonged assault.

Viewing the evidence in a light most favorable to Mollette, the Court finds that Officer Richardson used excessive force in tackling him and slamming him to the pavement. Nevertheless, Richardson is entitled to qualified immunity on this portion of Mollette's claim because, at that time, the law in this Circuit did not clearly put Richardson on notice that such conduct was unlawful.  <u>Id.</u> at 579-80 ("we have been unable to identify a single case predating the conduct at issue that prohibits tackling in a materially similar context").

### b.    Subsequent Assault

It is undisputed that, after Mollette was taken to the ground, Defendants put their weight on him, maced him, punched him with their fists, administered several knee strikes, and hit him with a flashlight.  Defendants argue that this use of force was objectively reasonable because Mollette continually struggled and refused to obey their commands to put his hands behind his back.  They further note that Mollette was under the influence of drugs and alcohol.  According to Defendants, Mollette's conduct posed an immediate threat to the safety of the officers and bystanders and, because the situation was dangerous and rapidly evolving, they needed to

quickly restrain him to bring things under control.[7]  Citing <u>Malley v. Briggs</u>, 475 U.S. 335

(1986), Defendants argue that because reasonably competent officers could disagree about

whether the force used was reasonable under these circumstances, they should be granted

qualified immunity.

Whether a defendant is entitled to qualified immunity is a question of law, but if that

question "turns on which version of facts one accepts, the jury, not the judge, must determine

liability." <u>Sova v. City of Mt. Pleasant</u>, 142 F.3d 898, 903 (6th Cir. 1998).  In the Court's view,

this is one of those cases.[8]  There are several significant factual disputes that need to resolved

before it can be determined if the officers' conduct was objectively reasonable.  The first dispute

involves the nature of Mollette's conduct during the course of the arrest; the other disputes

concern the conduct of the officers.

While Mollette admits that he failed to comply with orders to put his hands behind his

back (Mollette Dep. at 72-73), he denies that he was resisting arrest.  He claims that he was

simply trying to get his hands to the ground so that he could push his face up off the pavement to

protect it from further injury.  According to Mollette, every time he tried to raise his head up, the

officers pushed it back to the ground and rubbed his face on the pavement.  Defendants,

however, vehemently deny that Mollette was just trying to protect his face.  They maintain that

---

[7] Mollette denies that he posed a safety threat to the officers or to anyone else.  He was not armed, and it is undisputed that he did not hit, grab, or threaten any of the Columbus police officers.

[8] The Court previously denied Mollette's motion for partial summary judgment on the excessive force claim, holding that "there are factual disputes that must be determined by a jury before it can be determined whether the amount of force used by the officers against Mollette was reasonable and necessary."  (3/29/07 Mem. Op. & Order at 11).

he was actively resisting arrest and impeding their efforts to handcuff him.  (Barnes Dep. at 32;

Paden Aff. ¶ 6).  Whether the officers reasonably believed that Mollette was actively resisting

arrest is a key consideration in determining whether the amount of force they used against him

was objectively reasonable.

Even if a jury were to find that the officers reasonably believed that Mollette was actively

resisting arrest, the jury could nevertheless conclude that the officers used excessive force.

There are, of course, limits to how much force can reasonably be used to handcuff someone.  See

Goodrich v. Everett, 193 F. App'x 551, 557 (6th Cir. 2006) ("Clearly, some force may be wildly

disproportionate for the purpose of handcuffing a suspect, and may constitute excessive force

regardless of whether a suspect has already been subdued."); Shreve v. Jessamine County Fiscal

Court, 453 F.3d 681, 687 (6th Cir. 2006) (prolonged beating with a stick and jumping up and

down on suspect's back with a knee after throwing her to the ground and macing her "cannot be

deemed reasonable").

Officer Paden testified at his deposition that once Mollette was taken to the ground, the

officers continued to apply increased levels of force without pausing to give Mollette any

meaningful opportunity to comply with their repeated requests to put his hands behind his back.

Paden testified as follows:

> Q.    . . . you are giving him these orders to lay down and put his
> hands behind his back and he's also receiving blow after
> blow, those things were happening at the same time,
> correct?
> A.    That is correct, sir.
> Q.    And here's what I'm really wondering: did you consider at
> any time during your arrest of Mr. Mollette that you should
> stop hitting him for a second and step back and give him a
> time to voluntarily comply?
> A.    No, not on this arrest, sir.

Paden Dep. at 44.

In the Court's view, under the circumstances presented here, it is up to a jury to decide whether the officers' conduct was objectively reasonable. Moreover, although the amount of force used against Mollette is largely undisputed, there are disagreements over two significant details. First, there is a factual dispute about what part of Mollette's body Officer Paden struck with the flashlight. Officer Paden claims that he struck Mollette only on the torso and leg. (Id. at 23-24). Mollette, however, contends that Officer Paden struck him with the flashlight three times on the left ear. (Mollette Dep. at 69, 75, 79). If Mollette is to be believed, this conduct, standing alone, could give rise to a constitutional violation. The Sixth Circuit has repeatedly held that "a blow to an individual's head may constitute excessive force," and that it is objectively unreasonable to strike a suspect in "such a sensitive and vitally important part of [his] body." Baker v. City of Hamilton, 471 F.3d 601, 609 (6th Cir. 2006) (citing earlier cases).

There also appears to be a factual dispute about when, during the course of the arrest, Defendants maced Mollette. Defendants claim that they maced him twice, both within seconds after he was taken to the ground. They claim that because the mace had no effect on him, they had to then increase the level of force. (Barnes Dep. at 13, 15; Richardson Dep. at 21). However, according to Mollette's deposition, the officers maced him after he was already handcuffed and his legs had been secured with a hobble strap. (Mollette Dep. at 81). Such a use of force would clearly be excessive as a matter of law. See Adams v. Metiva, 31 F.3d 375, 386 (6th Cir. 1994); Phelps v. Coy, 286 F.3d 295, 301 (6th Cir. 2002).

Because there are material factual disputes concerning what happened during the course of Mollette's arrest, it is impossible to determine, at this juncture, whether the officers' conduct

18

was objectively reasonable under the circumstances. The availability of qualified immunity in this case turns on whose version of the story is to be believed. Therefore, with respect to Mollette's claim that the officers used excessive force against him after he was tackled, the Court must deny Defendants' motion for summary judgment.

### B. Municipal Liability

A municipality cannot be held liable under § 1983 simply because its employees engage in unconstitutional conduct. A plaintiff seeking to prevail in a § 1983 suit against a municipality must prove that a policy or custom of the municipality was the "moving force" behind the alleged constitutional violation. Monell v. Department of Soc. Servs., 436 U.S. 658, 694 (1978). Such a policy or custom may consist of: "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." Thomas v. City of Chattanooga, 398 F.3d 426, 429 (6th Cir. 2005).

In his Amended Complaint, Mollette alleged that the acts of the Columbus police officers were proximately caused by certain customs and policies of the City of Columbus, including the failure to adequately train, supervise and discipline police officers regarding the use of force and the filing of criminal charges. (Am. Compl. ¶ 24). Defendants argue that summary judgment is appropriate because Mollette has failed to identify any specific policy or custom at issue and has failed to present any evidence that a policy or custom of the City caused the alleged constitutional violations.

Despite the broader allegations contained in the Amended Complaint, Mollette's memorandum in opposition to Defendants' motion for summary judgment appears to be focused

solely on the theory that the alleged constitutional violations were caused by the City's custom or policy of failing to discipline officers who use excessive force during the course of arrests. Mollette has presented no evidence in support of his "failure to train" claim, and has presented no evidence that a custom or policy of the City caused him to be prosecuted without probable cause.  The Court therefore presumes that he has abandoned those claims against the City.

At issue is whether Mollette has submitted sufficient evidence from which a reasonable jury could find that the City had a custom or policy of failing to supervise and discipline officers who engaged in use of excessive force, and that such a custom or policy was the cause of the injuries he suffered.  The Court finds that Mollette has failed to satisfy this burden.

As evidence that the City has a custom or policy of allowing its officers to use excessive force against its citizens during the course of an arrest, Mollette points to: (1) Lieutenant Fineran's investigative report of this incident; (2) Sergeant Barnes' participation in assault against him; and (3) disciplinary records of Officers Paden and Richardson.

Lieutenant William Fineran conducted an internal "Response to Resistance" investigation concerning the degree of force used by the officers during Mollette's arrest.  He concluded that all of the force used by the officers against Mollette was necessary, justified, and within departmental policy.  Fineran testified at his deposition as follows:

> A. That means that their actions were consistent with what we use to guide our responses to resistance that's a use of force continuum.
> Q. Or to put it in a layman's terms, the amount of force that these officers used on . . . Mr. Mollette under these circumstances is permitted by the policies of the Columbus Police Department.  Correct?
> A. By their training and policies, correct.
> . . .
> Q. Is it fair to say . . . based on your experience in the police

20

> > department over all these years, that the amount of force
> > those officers used on Mr. Mollette in this arrest would be
> > customarily accepted as appropriate within the police force
> > under those circumstances?
>
> A.    Yes.

(Fineran Dep. at 22-23).

Mollette points out that the officers' conduct was also approved by a sergeant, two lieutenants, three commanders, and a deputy chief as being within departmental policy. As additional evidence that the amount of force used against him was customarily accepted by the department, Mollette further notes that Sergeant Barnes, a supervisor, participated in the assault against him. Mollette then argues that if a jury found that the amount of force used during the course of his arrest was excessive, then the fact that the amount of force used fell within the boundaries of what was customarily accepted as appropriate by the police department is evidence that the City has a custom or policy of permitting excessive use of force.

The Court rejects this argument for several reasons. First, because Sergeant Barnes is not an official with final decision-making authority, his participation in the alleged assault is insufficient to establish municipal liability. See Miller v. Calhoun County, 408 F.3d 803, 816 (6th Cir. 2005) ("a single act may establish municipal liability only where the actor is a municipal policy-maker."). Likewise, because none of the supervisors who ratified Defendants' conduct is an official with final decision-making authority, their approval does not constitute a policy or custom of the City. Moreover, subsequent ratification of the officers' conduct in this case cannot logically be the moving force behind the alleged constitutional violation. Alexander v. Beale Street Blues Co., Inc., 108 F. Supp. 2d 934, 949 (W.D. Tenn. 1999).

21

In order to succeed on his "failure to supervise and discipline" claim against the City, Mollette must prove that his case is symptomatic of a much larger problem. More specifically, he must prove:

> (1) the existence of a clear and persistent pattern of [illegal activity];
> (2) notice or constructive notice on the part of the [defendant];
> (3) the [defendant's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and
> (4) that the [defendant's] custom was the "moving force" or direct causal link in the constitutional deprivation.

Thomas, 398 F.3d at 429 (citing Doe v. Claiborne County, 103 F.3d 495, 508 (6th Cir. 1996)).

See also Berry v. City of Detroit, 25 F.3d 1342, 1354 (6th Cir. 1994) ("In the failure to discipline context, it is appropriate to apply the deliberate indifference standard . . . to require a showing of a history of widespread abuse that has been ignored by the City.").

As evidence that the City has a custom of tolerating use of excessive force, Mollette has submitted portions of the disciplinary files of Officers Paden and Richardson. (Exs. 7 and 8 to Mem. in Opp'n Mot. Summ. J.).[9] Mollette points out that they have been the target of numerous citizen complaints, disciplinary incidents, and "alert letters," some involving use of excessive force. He claims that in almost every instance, their conduct was approved by the City and, in the few instances where the complaints were sustained, little or no discipline was imposed.

_____

[9] Defendants object to the admissibility of portions of these exhibits. Each exhibit starts with what appears to be a compilation summary that includes incident dates and numbers, the name and address of the complaining party, a phrase describing the nature of the complaint, and the outcome. The Court agrees with Defendants that these summaries are inadmissible since it is not known who compiled the summaries, when they were compiled, or for what purpose.

Mollette has submitted "employee reports" generated by the Internal Affairs Bureau of the Division of Police. These reports show the disposition of citizen complaints and internal investigations involving Officers Paden and Richardson, and list the officers' self-reported uses of force, uses of mace, and injuries to prisoners. It appears that the incident dates in Officer Paden's file range from February of 1996 to April of 2003, and the incident dates in Officer Richardson's file range from February of 2001 to June of 2005. As Defendants correctly point out, any incidents that occurred after October 21, 2002 are irrelevant to a determination of whether a custom or policy of the City caused Mollette's alleged injuries. Also irrelevant are citizen complaints and internal investigations concerning conduct involving anything other than a use of force. The only relevant incidents are those that occurred prior to October 21, 2002 and involved a use of force, use of mace, or injury to a prisoner.

Defendants argue that these incidents are insufficient to establish that the City had a custom or policy of tolerating the use of excessive force. The Court agrees. As noted above, Mollette must show "the existence of a clear and persistent pattern of illegal activity." Thomas, 398 F.3d at 429. The employee reports submitted by Mollette show no such pattern. Those reports show that Officers Paden and Richardson used mace several times each year, and used force or were involved with an injury to a prisoner an average of once or twice each year. The records also show that their conduct was consistently found to be within departmental policy. (Exs. 7 & 8 to Mem. in Opp'n). Without any information about the details surrounding these reported incidents, or the details of the investigations that ensued, the employee reports are of little use in determining whether the force used in each case was, in fact, justified. Moreover, Mollette has presented no statistical data that would support a finding that the number of times

23

these two officers resorted to a use of force during the course of an arrest, or that the number of complaints filed against them, was out of the ordinary. See Thomas, 398 F.3d at 430-31.

Even if Mollette could establish a clear and persistent pattern of excessive force, he has not submitted sufficient evidence from which a reasonable jury could find that the City was deliberately indifferent to the problem. In Miller v. City of Columbus, No. 2:05-cv-425, 2007 WL 915180, at *15 (S.D. Ohio March 26, 2007), the Court held that "[t]o prevail on a claim of failure to . . . discipline, Plaintiff must prove that the City had a policy or custom of failing to act upon similar complaints of unconstitutional conduct." Mollette cannot do so. In fact, the evidence he submitted supports a finding to the contrary.

Mollette submitted copies of intra-divisional memos sent by the Internal Affairs Bureau ("IAB") to Paden's supervising commanders on March 1, 2003, July 3, 2003, August 7, 2003, and September 1, 2003. Each memo noted that Paden had been the subject of three or more citizen complaints within the previous 12 months. The memos directed the commanders to bring the information to the attention of Paden's immediate supervisor to determine whether there was a problem developing that needed to be addressed. (Ex. 7 to Mem. in Opp'n).

Mollette has submitted two memos sent by Sergeant Thomas Miller to Chief of Police James Jackson in response to the IAB memos. The first memo, dated March 15, 2003, reviewed six citizen complaints stemming from incidents that occurred between February 8, 2002 and November 10, 2002. Some complained of rude or discourteous behavior; others complained of excessive force. While Sergeant Miller concluded that the complaints were unfounded, he nevertheless found that "the number of complaints within the specified time period warrant some action." Id. Miller ordered Paden to attend classes on the "Art of Listening" and "Dealing with

24

Difficult Customers."  Miller also stated that he would "continue to monitor Officer Paden closely and try to help him reduce these complaints."  Id.  The second memo, dated March 19, 2003, reviewed three additional citizen complaints involving a use of force.[10]  Miller concluded that the uses of force were within departmental policy and that he did "not see a pattern that would reveal a concern of Officer Paden's discretion to use physical force at this time."  Id.

These memos are proof that the City is not deliberately indifferent to citizen complaints involving use of excessive force.  The City reviewed each complaint and each self-reported use of force to determine whether the officer engaged in wrongdoing.  In addition, once a certain number of complaints were filed against a particular officer, a more in-depth investigation was conducted to determine whether there was a problem that needed to be addressed.  In Paden's case, after investigating some of the citizen complaints, Sergeant Miller determined that Paden would benefit from classes to improve his interpersonal communication skills.  Although Miller also concluded that there was no need to be concerned that Paden was engaged in a pattern of use of excessive force, the fact that he was alerted to a potential problem and conducted an investigation counsels against a finding of deliberate indifference.  Based on the evidence presented, no reasonable jury could find that the City was deliberately indifferent to the alleged problem.

Finally, Mollette has presented no evidence to establish the requisite causal connection, i.e., that the City's alleged custom of tolerating the use of excessive force was the "moving force" behind the alleged constitutional deprivation.  There is absolutely no evidence that any of the officers relied on the fact that previous uses of force had not resulted in any disciplinary

---

[10]  One of these complaints was Mollette's.

actions.  Because Mollette has failed to present sufficient evidence from which a reasonable jury could find that the City had a custom or policy of failing to supervise and discipline officers who engaged in use of excessive force, and that such a custom or policy was the cause of the injuries he suffered, the Court grants the City's motion for summary judgment.

**IV.     Conclusion**

For the reasons stated above, the City Defendants' motion for summary judgment (Record at 42) is **GRANTED IN PART and DENIED IN PART.**  The Court grants summary judgment in favor of all Defendants on Plaintiff Mollette's claims of arrest and prosecution without probable cause.

As to the claim of excessive force, the Court finds that the individual officers are entitled to qualified immunity on Mollette's claim that Officer Richardson used excessive force when he tackled him from behind without warning.  However, genuine issues of material fact preclude summary judgment on Mollette's claim that Defendants Paden, Barnes, Richardson, and Paige used excessive force against him once he was taken to the ground.

The City of Columbus is entitled to summary judgment on all claims asserted by Mollette.

**IT IS SO ORDERED.**

Date: August 16, 2007                                    **/s/ John D. Holschuh**
                                                          John D. Holschuh, Judge
                                                          United States District Court